# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT

9/19/23

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WEST. DIV. DAYTON

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) ) |
| THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (937) 245-2830 | ) ) |

Case No.     3:23-mj-386

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Southern _____ District of _____ Ohio _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) | distribution of controlled substances |
| 21 U.S.C. §§ 841(b)(1)(C) | possession with intent to distribute a substance containing methamphetamine |

The application is based on these facts:

See attached affidavit of Frederick Zollers

☑ Continued on the attached sheet.

☑ Delayed notice of __30__ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*To ensure technical compliance with the Pen Register Statute, 18 U.S.C. §§ 3121-3127, this warrant also functions as a pen register order. Consistent with the requirement for an application for a pen register order, I, Jahan Karamali, certify that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by the FBI. See 18 U.S.C. §§ 3122(b), 3123(b).

_____
*Applicant's signature*

Frederick Zollers, FBI TFO
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by reliable electronic means
-- namely, telephone

Date:     September 19, 2023

City and state:     Dayton, Ohio

_____
Caroline H. Gentry
United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER **937-245-2830** THAT IS THE CUSTODY OR CONTROL OF AT&T | Case No. _3:23-mj-386_<br><br>**Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Frederick Zollers, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number **937-245-2830, (the "Target Cellular Device")**, whose service provider is **AT&T**, a wireless telephone service provider headquartered at 11760 U.S. Highway 1, North Palm Beach, Florida 33408. The **Target Cellular Device** is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.      Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

3.     I am a Task Force Officer ("TFO") with the Federal Bureau of Investigation ("FBI"), assigned to the Cincinnati Division, Dayton, Ohio Resident Agency. I am therefore an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 21 U.S.C. § 878. Moreover, I am an "investigative law enforcement officer" within the meaning of 18 U.S.C. § 2510. I've been a sworn law enforcement officer in the State of Ohio for seventeen years. I am presently a sworn member of the Montgomery County Sheriff's Office ("MCSO"). I am currently assigned to the FBI Southern Ohio Safe Streets Task Force ("SOSSTF") as a TFO.

4.     I have been involved in narcotics related arrests; the execution of search warrants, which resulted in the seizure of narcotics; and supervised the activities of informants who provided information and assistance resulting in drug buys. Since 2014, I received training and experience in interviewing and interrogation techniques; arrest, search and seizure procedures; narcotics investigations; and various other criminal investigations resulting in successful prosecution. In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies. In the course of conducting narcotics investigations, I have been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; conducting undercover operations; consensual monitoring and recording of both telephonic and nontelephonic communications; analyzing telephone pen register and caller identification system data; conducting court-authorized wire and oral interception electronic surveillance; and preparing and executing search warrants which have led to substantial seizures of narcotics, firearms, contraband, and evidence of criminal activity. I have repeatedly encountered a practice wherein drug traffickers distribute a cellular telephone

2

number to their drug customers, often described by traffickers as a "money phone." The money phone is used primarily to communicate with those customers. The customers will subsequently call or send a text message to the trafficker on that cellular telephone number to arrange a purchase of drugs as needed. Based on training and experience, I know drug traffickers often possess and use multiple cellular phones. Through my training, I have become familiar with coded terminology utilized by drug trafficking organizations to disguise their illegal activities and the way they conduct these illegal activities.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other FBI Special Agents/Task Force Officers in the Southern District of Ohio. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

6. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). have been committed, are being committed, and will be committed by RONALD L. PARKER JR. utilizing the **Target Cellular Device**. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations.

7. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

8. On or about Friday, July 28, 2023, members of the Regional Agencies Narcotics and Gun Enforcement Task Force ("RANGETF"), the FBI SOSSTF, and I conducted a proactive

operation to combat drug trafficking violations utilizing undercover officers in attempt to meet and gain introductions to individuals trafficking illegal narcotics within the Dayton, Ohio area. RANGETF Detective Overholt and I acted in an undercover capacity during the operation. At approximately 2:00 p.m., Detective Overholt and I were parked in our undercover vehicle at the BP Gas Station, located at 3898 Salem Avenue, Montgomery County, Ohio. We were approached by a black male, later identified as RONALD L. PARKER JR. (hereinafter "PARKER") who arrived at the gas station in a maroon Buick LeSabre. PARKER identified himself as "ACE" and told Detective Overholt and I that he had marijuana and other narcotics for sale. PARKER then partially removed a clear plastic baggie containing suspected marijuana from his rear jean shorts pocket and showed Detective Overholt and I. I told PARKER we were looking for "cream" (a street term for methamphetamine) and he then partially removed other baggies of what appeared to be methamphetamine and an unknown white powder from his front jean short pockets and showed Detective Overholt and I. PARKER agreed to sell us $60.00 worth of methamphetamine and asked if we had a scale. We told the PARKER we didn't have a scale. PARKER said he would try to purchase a scale from inside the gas station.

9.      Minutes later, PARKER returned to our undercover vehicle, said he was unable to purchase a scale, and he would just "eyeball" the amount of methamphetamine he would sell to us. PARKER then entered the backseat of our undercover vehicle and removed a plastic baggie that contained what appeared to be approximately an ounce or more of methamphetamine. PARKER broke off a chunk of methamphetamine from one of the large shards in the baggie and gave it to me. PARKER also gave me two buds of marijuana. Detective Overholt gave PARKER $60.00 of RANGETF buy funds in exchange for the methamphetamine. PARKER told Detective Overholt and I he had been selling narcotics since age 14 and he gave us the phone number of

4

(937) 979-3971 to call if we wanted to purchase more narcotics. PARKER then exited our undercover vehicle and re-entered the passenger seat of the LeSabre. Before departing, PARKER held up a potted marijuana plant to show Detective Overholt and I. PARKER departed the parking lot in the LaSabre. Task force members followed the LaSabre as the vehicle traveled north on Salem Avenue. Task force members observed PARKER exit the LaSabre in the area of Salem Avenue and Dartmoor Drive. Task force members last observed PARKER walking near the 4500 block of Dartmoor Drive carrying the potted marijuana plant. The suspected methamphetamine was submitted to the Miami Valley Regional Crime Laboratory ("MVRCL") to be analyzed, and results confirmed the substance tested positive for methamphetamine (a Schedule II narcotic) having an approximate net weight of 5.04 grams.

10. Investigators researched the phone number that PARKER provided through law enforcement databases and linked the phone number to the name "Ronald Parker" at the address 4508 Dartmoor Drive. Detective Overholt and I were familiar with "Ronald Parker" and 4508 Dartmoor Drive from a previous drug trafficking investigation conducted in July and August of 2022. During the 2022 investigation, Detective Overholt and I investigated Ronald Lester Parker III (herein after "Parker III") for drug trafficking and ultimately arrested Parker III and executed a search warrant at 4508 Dartmoor Drive on August 16, 2022. Pursuant to the search warrant, task force members seized in excess of 459 grams of cocaine (Schedule II), 55 grams of methamphetamine (Schedule II), and 25 grams of fentanyl (Schedule II) from 4508 Dartmoor Drive. Additionally, several firearms were seized during execution of the search warrant. Parker III was sentenced to 51 months imprisonment for knowingly and intentionally possessing with intent to distribute cocaine and methamphetamine, both Schedule II controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) (see case no. 3:23-cr-1).

11.  At the time of execution of the search warrant, task force members located a tan safe in the east bedroom of 4508 Dartmoor that contained approximately 287 grams of cocaine, approximately 25 grams of fentanyl, approximately 106 grams of methamphetamine and approximately $599.00 in U.S. currency not attributable to Parker III. Investigators spoke with a ███ resident of 4508 Dartmoor, on scene at the time of execution of the warrant, who advised that ███, identified as PARKER, also resided there. Our investigation revealed PARKER is Ronald Lester Parker III's son. PARKER responded to 4508 Dartmoor Drive during execution of the search warrant and spoke with investigators. In summary, PARKER told investigators when he sleeps at 4508 Dartmoor Drive he stays in the east bedroom. PARKER said he owned the tan safe located in the east bedroom. However, PARKER said other people had access to his safe. PARKER said he had some U.S. currency in the tan safe but denied any knowledge of the suspected narcotics located in the safe.

12.  After linking phone number (937) 979-3971 to the name Ronald Parker and the address 4508 Dartmoor Drive, Detective Overholt and I reviewed a photograph of PARKER obtained from both a law enforcement database and an open-source social media platform. Detective Overholt and I positively recognized PARKER, age 31, to be the male that identified himself as "ACE" and sold Detective Overholt and I methamphetamine on July 28, 2023. I performed a criminal record check concerning PARKER and learned that he had a criminal history, including a 2019 conviction in the Montgomery County, Ohio, Court of Common Pleas for: aggravated possession of drugs (Schedule I or II). Additionally, PARKER had a 2021 conviction in the Montgomery County, Ohio, Court of Common Pleas for: having weapons while under disability and improper handling of a firearm in a motor vehicle.

13.     On August 3, 2023, members of the RANGETF, SOSSTF, and I conducted a controlled narcotics buy from PARKER. Detective Overholt and I acted in an undercover capacity during the operation. Task force members established surveillance in the area of 4508 Dartmoor Drive during the operation. Detective Overholt placed a controlled call to phone number (937) 979-3971 and spoke to PARKER. Detective Overholt arranged to purchase a "zip" (street term for ounce) of methamphetamine. PARKER agreed to the sale and told Detective Overholt to call him when we arrived in the Dayton area. Detective Overholt and I departed from our staging location and drove toward Salem Avenue. While driving, PARKER called Detective Overholt and told him to drive to the McDonald's parking lot near the intersection of Salem Avenue and Free Pike. After arriving at the McDonald's parking lot and waiting for a period of time, Detective Overholt called PARKER and PARKER directed Detective Overholt to drive to the Rally's parking lot near the intersection of Salem Avenue and Evansville Avenue. Around the time PARKER directed Detective Overholt to the Rally's, RANGETF Detective Mike Hulbert observed two black males exit the front door of 4508 Dartmoor Drive and enter a black Pontiac Grand Am, Ohio registration JXN7349, that was parked in the driveway. The males then departed 4508 Dartmoor Drive in the Grand Am and traveled south on Salem Avenue toward the Rally's. Detective Overholt and I observed the Grand Am turn onto Evansville Avenue from Salem Avenue. Detective Overholt and I observed PARKER seated in the driver's seat and an unknown black male seated in the front passenger seat. PARKER motioned for us to follow him as he drove east on Evansville Avenue. Detective Overholt and I followed PARKER in our undercover vehicle to the intersection of Falmouth Avenue and Detroit Avenue. At the intersection, PARKER exited the Grand Am and approached the driver's door of our undercover vehicle. PARKER provided Detective Overholt with a clear plastic baggie of suspected methamphetamine in exchange for

$120.00 in RANGETF buy funds. PARKER re-entered the Pontiac Grand Am and departed the area.

14. Detective Overholt and I also departed the area and traveled north on Salem Avenue. Minutes later, Detective Overholt received a call from PARKER on the (937) 979-3971 phone number. PARKER said he had mistakenly given us a larger baggie of methamphetamine he was carrying that he intended to use for another transaction. Detective Overholt asked PARKER how much money we would owe him if we kept the baggie we already had. PARKER said it would be another "80 cents" (street term for $80.00 in U.S. currency). Detective Overholt told PARKER we would be able to pay him the extra money for the baggie and arranged to call him back shortly. Detective Overholt called PARKER back and PARKER directed us to the BP Gas Station, located at 3898 Salem Avenue. Detective Overholt and I drove to the BP Gas Station and parked. Minutes later, PARKER arrived driving the Pontiac Grand Am. PARKER exited the Pontiac Grand Am and approached the driver's door of our undercover vehicle. I provided PARKER with the additional $80.00 in RANGETF buy funds. Detective Overholt and I then departed the area. Task force members terminated surveillance on PARKER after Detective Overholt and I departed from the BP Gas Station. The methamphetamine was submitted to the MVRCL to be analyzed for content. I later received lab results indicating the methamphetamine (a Schedule II narcotic) tested positive and has an approximate net weight of 44.77 grams.

15. On August 7, 2023, members of the RANGETF, FBI SOSSTF, and I conducted a controlled narcotics buy from PARKER. Detective Overholt and I acted in an undercover capacity during the operation. Task force members established surveillance in the area of 4508 Dartmoor Drive during the operation. The black Pontiac Grand Am, Ohio registration JXN7349, that PARKER drove to the previous controlled buy, was parked in the driveway of 4508 Dartmoor

Drive. Detective Overholt placed a controlled call to phone number (937) 979-3971 and spoke to PARKER. Detective Overholt arranged to purchase a "zip" (street term for ounce) of methamphetamine. PARKER directed Detective Overholt to drive to the area of the Home Depot off Salem Avenue. Detective Overholt did so and then called PARKER and told him we were able to purchase the same quantity as last time (approximately 2 ounces) if he had the supply. PARKER said the amount was not a problem and he would call back shortly with instructions where to meet. PARKER advised the price for 2 ounces would be $250.00. Soon after, PARKER called Detective Overholt and directed us to meet him at 4321 Salem Avenue. When close to 4321 Salem Avenue, Detective Overholt called PARKER at (937) 979-3971 and PARKER stayed on the phone with Detective Overholt while directing us to turn onto Fairgreen Drive. As Detective Overholt and I turned onto Fairgreen Drive, we observed PARKER standing in a parking lot on the north side of Fairgreen Drive.

16.     PARKER entered the back seat of our undercover vehicle and instructed us to drive south on Salem Avenue so that we could drive him to the "Store." As I was driving, PARKER handed Detective Overholt a clear plastic baggie of suspected methamphetamine. Detective Overholt gave PARKER $250.00 in RANGETF buy funds. After the transaction was completed, PARKER had us drop him off in the parking lot of Premier Auto Mall, located at 4299 Salem Avenue. Detective Overholt and I then departed the area. Task force members terminated surveillance on PARKER once Detective Overholt and I departed the area. The methamphetamine was submitted to the MVRCL to be analyzed for content. I later received lab results indicating the methamphetamine (a Schedule II narcotic) tested positive and has approximate net weight of 55.56 grams.

17.     On August 8, 2023, RANGETF and FBI SOSSTF members executed a search warrant at 2664 Grant Avenue, Dayton, Ohio. The search warrant was the result of a drug trafficking investigation involving an individual identified as Antonio Allen (hereinafter "ALLEN"). When Detective Overholt and I met PARKER and purchased methamphetamine from him on July 28, 2023, PARKER mentioned he had a "Spot" off Grant Avenue behind the Popeyes restaurant. The residence of 2664 Grant Drive is located behind the Popeyes restaurant. On August 8, 2023, task force members seized illegal narcotics, including methamphetamine, and a firearm, pursuant to execution of the search warrant at 2664 Grant Avenue. ALLEN was arrested and charged with possession with intent to distribute methamphetamine and possession of a firearm as a prohibited person and booked into the Montgomery County Jail. ALLEN had an unrelated warrant for his arrest out of Greenville, Ohio and he was later transported to the Darke County Jail on unrelated charges.

18.     On August 11, 2023, Detective Overholt and I attempted to contact PARKER on the (937) 979-3971 phone number to arrange for the purchase of methamphetamine. Detective Overholt and I were unable to get in contact with PARKER and it appeared the cellular phone was turned off.

19.     After ALLEN was booked into the Darke County Jail, I inquired through investigators with the Darke County Sheriff's Office regarding any recorded phone calls that ALLEN made while incarcerated at the Darke County Jail. I learned that ALLEN placed a call to the **Target Cellular Device**. The Darke County Jail phone recording system, Securus, associated the name "Ronald Parker" and the address of 4508 Dartmoor Drive to the **Target Cellular Device**. From approximately August 16, 2023, through September 3, 2023, ALLEN placed seven (7) recorded calls to the **Target Cellular Device**. I reviewed several of the recorded calls that ALLEN

placed to the **Target Cellular Device** and I recognized the voice of the male that ALLEN was speaking with to be PARKER's voice. During some of the recorded conversations, ALLEN attempted to speak with PARKER in code, alluding to drug trafficking activity and warned PARKER to be careful.

20.　Pursuant to a subpoena, I received provider and subscriber information for the **Target Cellular Device**. The service provider of the **Target Cellular Device** was identified as **AT&T**. The subscriber of the **Target Cellular Device** was identified as PARKER with an address of 4508 Dartmoor Drive. Additionally, investigators were able to associate PARKER with the **Target Cellular Device** through law enforcement databases and an open-source media platform.

21.　After August 11, 2023, Detective Overholt and I attempted to contact PARKER at cellular phone number (937) 979-3971; however, it appears the cellular device is intermittently turned on and off. Based on training and experience, I know that drug traffickers utilize multiple cellular phones; often using one phone, the "money phone" to arrange for sales with drug addicted persons, and using another phone, in this case, the **Target Cellular Device**, to contact friends, family members and their suppliers. The **Target Cellular Device**, associated with PARKER, is being utilized to contact ALLEN, who PARKER supplies with drugs, and family members like Parker III.

22.　Based on training and experience, I know obtaining location information on the **Target Cellular Device** will assist investigators in identifying PARKER's location as he will have the cellular phone with him, as well as other locations to include: drug stash houses where narcotics and items associated with drug trafficking as well as drug proceeds are stored. The requested information on the **Target Cellular Device**, associated with PARKER and 4508 Dartmoor Drive,

will assist law enforcement in apprehending a fugitive for whom an active arrest warrant on federal complaint has been issued.

23.    In my training and experience, I have learned that **AT&T** is a company that provides cellular telephone access to the public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

24.    Based on my training and experience, I know that **AT&T** can collect E-911 Phase II data about the location of the **Target Cellular Device** by initiating a signal to determine the location of the **Target Cellular Device** on **AT&T's** network or with such other reference points as may be reasonably available.

25.    Based on my training and experience, I know that **AT&T** can collect cell-site data about the **Target Cellular Device**.

## AUTHORIZATION REQUEST

26.     Based on the foregoing, I request the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

27.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the **Target Cellular Device** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

28.     I further request the Court direct **AT&T** to disclose to the government any information described in Attachment B that is within the possession, custody, or control of **AT&T**. I also request the Court direct **AT&T** to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with **AT&T's** services, including by initiating a signal to determine the location of the **Target Cellular Device** on **AT&T's** network

13

or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate **AT&T** for reasonable expenses incurred in furnishing such facilities or assistance.

29.     I further request the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **Target Cellular Device** outside of daytime hours.

30.     I further request the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Frederick Zoller
Task Force Officer
Federal Bureau of Investigation

By telephone
Subscribed and sworn to ~~before me~~ on this   19th   day of September, 2023.



Caroline H. Gentry
United States Magistrate Judge

14

## ATTACHMENT A

### Property to Be Searched

1. The cellular telephone assigned call number **937-245-2830,** (the **"Target Cellular Device"**), whose wireless service provider is **AT&T**, a wireless telephone service provider headquartered at 11760 U.S. Highway 1, North Palm Beach, Florida 33408.

2. Information about the location of the **Target Cellular Device** that is within the possession, custody, or control of **AT&T** including information about the location of the cellular telephone if it is subsequently assigned a different call number.

## ATTACHMENT B

### Particular Things to be Seized

All information about the location of the **Target Cellular Device** described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the **Target Cellular Device**" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of **AT&T, AT&T** is required to disclose the Location Information to the government. In addition, **AT&T** must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with **AT&T's** services, including by initiating a signal to determine the location of the **Target Cellular Device** on **AT&T's** network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate **AT&T** for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).